```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TENNESSEE
 2    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

 3     UNITED STATES OF AMERICA     : NO. 15-CR-20299(JPM)
                      PLAINTIFF,    :
 4                                  :
                VS.                 : UNITED STATES COURTHOUSE
 5                                  : MEMPHIS, TENNESSEE
                                    :
 6     BRANDON JONES                : MAY 2, 2016
                      DEFENDANT.    : 2:30 P.M.
 7    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

 8

 9

10

11          CRIMINAL CAUSE FOR MOTION HEARING (56)
           BEFORE THE HONORABLE JON PHIPPS MCCALLA
12            UNITED STATES DISTRICT COURT JUDGE

13                      _ _ _ _ _

14
                     A P P E A R A N C E S:
15

16  FOR THE GOVERNMENT:        U.S. ATTORNEY'S OFFICE
                               167 NORTH MAIN, STE. 800
17                             MEMPHIS, TENNESSEE 38103
                               BY:  DEBRA IRELAND, ESQ.
18
    FOR DEFENDANT :            HARVIEL LAW OFFICE
19                             140 JEFFERSON, 2ND FLOOR
                               MEMPHIS, TN  38103
20                             BY:  T. CLIFTON HARVIEL, JR., ESQ.

21
                    NICOLE M. WARREN, RMR, CRR
22                       OFFICIAL REPORTER

23

24

25



                    UNREDACTED TRANSCRIPT
```

1 (In open court; all counsel and Defendant Jones
2 present.)
3 THE COURT: Mr. Harviel, I think we need to see you
4 also today.
5 MR. HARVIEL: Thank you, Judge.
6 THE COURT: Have we got everybody here for that case?
7 MR. HARVIEL: We do.
8 THE COURT: You need to bring the defendant in and I
9 think that we may have left that -- I looked at the file but we
10 may have left it in the back.
11 I think I've got it here.
12 COURTROOM DEPUTY: Okay.
13 THE COURT: I do. It's as to Mr. Jones. All right.
14 There's a motion in this case and -- yes, ma'am. Come
15 on up. Ms. Ireland, are you here for this one?
16 MS. IRELAND: I'm standing in for Ms. Weiland, Your
17 Honor.
18 THE COURT: Well, you're a good substitute. We're
19 glad to have you. Glad to have either one.
20 And, Mr. Jones, how are you doing?
21 THE DEFENDANT: I'm fine.
22 How you doing, sir?
23 THE COURT: I'm doing okay.
24 We've got kind of an unusual situation. I've gone
25 through. I've looked at the motion and it does contain some

1  rather inflammatory statements and sometimes it's not necessary
2  for the Court to make any determination about whether or not
3  those statements have been made, if it appears that the
4  relationship is so damaged that we should refer the matter for
5  another appointment.
6          And I'll be the first to say that I would be shocked
7  if they were made, but it would indicate to me that there may
8  be a very severely damaged relationship.  So, I'm hesitant, a
9  little hesitant to grant the motion only in the sense that
10 Judge Mays, I think, had heard something akin to this at some
11 other point in time.
12         Is that right?
13         MR. HARVIEL:  He had heard from Mr. Jones.  He had not
14 received a motion from us to withdraw.
15         THE COURT:  Right.  Right.  But now I have a motion to
16 withdraw from further representation by Mr. Harviel.
17         MR. HARVIEL:  Correct.  And I have Mr. Chapman here
18 with me who is the investigator who was present who can testify
19 about overhearing those comments.
20         THE COURT:  All right.  Is it your desire for me to
21 make a determination on the record regarding that?
22         MR. HARVIEL:  Yes, please.
23         THE COURT:  All right.  Well, let's let
24 everybody -- I'm going to let -- it's a little confusing.  I'm
25 going to actually ask defense counsel to move to the bench just

1  for a moment.  It may be a little uncomfortable for you to sit
2  exactly where that is.
3  　　　　And I'll let Mr. Jones go to the normal seat he would
4  occupy, and then I think I do need to hear from defense
5  counsel's investigator.
6  　　　　MR. HARVIEL:  Yes, sir.
7  　　　　Your Honor please, we would call Mr. Clark Chapman to
8  the stand.
9  　　　　THE COURT:  All right.  And, Mr. Chapman, if you would
10 step to the podium and raise your right hand, you're going to
11 be sworn in.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          CLARK CHAPMAN,

2   was thereupon called as a witness on behalf of the

3   Defense and, having been first duly sworn, was

4   examined and testified as follows:

5                       DIRECT EXAMINATION

6   BY MR. HARVIEL:

7   Q. Would you state your name for the record, please?

8   A. Clark Chapman.

9   Q. And, Mr. Chapman, how are you employed?

10   A. I own Eyewitness Investigations.

11   Q. And are you currently working on or have you currently been

12   working on the Brandon Jones case?

13   A. I have.

14   Q. And have you been out to Mason on multiple occasions?

15   A. Yes, sir.

16   Q. Have you been out to Mason on multiple occasions when I was

17   present?

18   A. That's correct.

19   Q. Did you have an opportunity to observe the interaction

20   between the client and the lawyer while you were present?

21   A. Yes, sir, I have.

22   Q. As far as any what I have termed threats, have you

23   overheard anything of that nature?

24   A. Yes, sir.

25   Q. What have you heard?

1  A.  The defendant seemed to be agitated, you know, when in
2  certain days that we've been out there and --
3         THE COURT:  Ask you to pull the mike just a little
4  closer.
5         THE WITNESS:  Sure.
6         THE COURT:  And I do have to be able to hear okay.
7         THE WITNESS:  Yes, sir.
8         THE COURT:  Go ahead.
9         THE WITNESS:  Seemed to have been very agitated when
10 the times we've been out there, discussing the case and on
11 probably three occasions we've had that conflict go on where
12 he's told Mr. Harviel he didn't want him back on his case or he
13 told him to get off of his case and called him names and told
14 him that, you know, if he come back out there, there was going
15 to be trouble.
16 BY MR. HARVIEL:
17 Q.  Come back out there, there was going to be trouble.
18 A.  Yes, sir.
19        MR. HARVIEL:  I pass the witness with that, Your
20 Honor.
21        THE COURT:  Well, I always tell people you can't clean
22 it up in court.  Unfortunately you have to tell me what he
23 said.  You don't get to -- you know, I don't like that
24 sometimes anymore than anybody else does but a sanitized record
25 is a record that fails to reflect the actual facts.

1              So, counsel, I'm afraid you've got to ask him --
2              MR. HARVIEL:  Okay.
3              THE COURT:  -- what was said.  I'm sorry, but there's
4  no way to get around it.
5  BY MR. HARVIEL:
6  Q.  Can you quote what was said?  And tell us what was said as
7  accurately as you recall.
8  A.  Yeah, there's some language that was not that great of
9  language.
10 Q.  Do you have --
11             THE COURT:  Well, the reason it's important is it goes
12 to the redeemability of the relationship.
13             MR. HARVIEL:  I understand.
14             THE COURT:  You just have to tell me what was said;
15 and if you have to say a few bad words, it won't be the first
16 time they've been said in court.
17 BY MR. HARVIEL:
18 Q.  Do you have some documents with you that reflect what you
19 overheard?
20 A.  Yes, sir, I do, yes, sir.
21 Q.  Can you -- you got those with you?
22 A.  They're --
23 Q.  They're on the table?
24 A.  They're on the table, yes, sir.
25             THE COURT:  That'd be fine.

1          MR. HARVIEL:  I'm sorry.  Where on the table?
2          THE WITNESS:  I think they were on your notepad.  I
3  stuck them over there when I got up here.
4          MR. HARVIEL:  Put them on my notepad?
5          THE WITNESS:  Just over there where your notes were.
6          MR. HARVIEL:  There we go.  I think this is what we're
7  looking for.
8          May I approach the witness, Your Honor?
9          THE COURT:  You may.
10 BY MR. HARVIEL:
11 Q.  I'm going to hand you some documents and ask you if you can
12 identify those, please.
13 A.  Yes, sir.  Yes, sir.
14 Q.  What are those?
15 A.  This is just time sheets, just showing more or less the
16 timeline of when we've been out to visit, what was done, what
17 was talked about during the times we went to visit with the
18 defendant.
19 Q.  Okay.  And are there some sections in there that you have
20 highlighted?
21 A.  Yes, sir.
22 Q.  Would you read those highlighted sections into the record,
23 please?
24 A.  Okay.  We visited with the defendant on 2/26.  Be
25 February 26th.  Defendant was upset with Mr. Harviel for

1  talking with the defendant's mother; and the attorney showed
2  defendant his notes, giving attorney permission to talk to his
3  mother.  Attorney tried to show defendant additional text
4  messages, and the defendant said he didn't give a fuck about
5  looking at web page history.  And then attorney tried to
6  continue --
7        THE COURT:  Sounds like you may have deleted a word
8  there, but I've got it down in the record.
9        THE WITNESS:  Yes, sir.  Yes, sir.
10        And, you know, he was just -- he was agitated that
11  day.
12        He -- and then on March the 16th the defendant was
13  agitated when we got there, confrontational with the attorney.
14  The meeting was ended by the attorney.  Defendant was agitated
15  beginning of the meeting.  Defendant asked the attorney why he
16  had called attorney Latonya Burrow who was on the defendant's
17  telephone records.  And that's when the defendant stated to the
18  attorney, "Get off my case, you soft-ass boy."
19        Okay.  Then let's see.  One other major one I think
20  here.  This would have been on April the 5th.  Okay.  Defendant
21  was upset that I had mentioned to his mother and Sierra
22  Hilliard that the charges against him were serious charges that
23  carried a lot of time.  After they asked me serious charges,
24  what the serious charges were, I informed them what the charges
25  were, only that they were serious charges and the defendant

1  wanted to talk to me why, you know, that, more about why we
2  couldn't talk about his mother's letter that she had wrote,
3  complaining about the attorney, Mr. Harviel.
4      And that's when defendant told Clifton he has been
5  rude to his family.  Defendant became agitated.  Attorney ended
6  the meeting and asked the guard to remove the defendant.
7      The defendant said, "If you come back again, there's
8  going to be trouble."  Defendant then said to Attorney Harviel,
9  "Get the fuck off my case, boy, you disrespectful bitch."
10      And then that's when the guards came in and removed
11  him.
12      THE COURT:  All right.  I'm sorry, counsel; but we do
13  have to know what's said.  We can't sugarcoat it.
14      MR. HARVIEL:  I understand.
15  BY MR. HARVIEL:
16  Q.  Those were your notes.
17      Is there anything else that you recall?
18  A.  Just, you know, just mainly I think that the defendant just
19  seemed to be agitated to some degree and asked for Mr. Harviel
20  to get off his case.
21  Q.  On the April the 5th incident, do you recall him and was
22  there some comment about, "If you come back, there's going to
23  be trouble"?
24  A.  Yes, sir.
25  Q.  That was the April 5th.

UNREDACTED TRANSCRIPT

1   A.  Yes, sir.
2           MR. HARVIEL:  That's -- to please the Court, Your
3   Honor, that's when I quit going out there and started writing
4   him.  That has not worked because --
5           THE COURT:  Have you sent correspondence?
6           MR. HARVIEL:  Yes.
7           THE COURT:  I know it's confidential.  So, I'm not
8   asking to look at that.
9           Have you received any reply to that?
10          MR. HARVIEL:  Not until this past week.
11          THE COURT:  All right.  And is there anything, a reply
12  that would indicate that you have a salvageable relationship?
13          MR. HARVIEL:  Not that I can see, Your Honor, no.
14          THE COURT:  All right.  There's an allegation about
15  using disrespectful language on your part.  I'm going to ask
16  you directly.  Did you ever say that?
17          MR. HARVIEL:  No, Your Honor.
18          THE COURT:  Okay.  I'm going to --
19          MR. HARVIEL:  I was very stern at times, but I don't
20  think I have been rude.
21          THE COURT:  All right.  I'm going to ask the witness:
22  Have you observed Mr. Harviel when he's been there?
23          THE WITNESS:  Oh, yes, sir, yes, sir.
24          THE COURT:  Has he used disrespectful language to the
25  defendant, or has he simply acted as counsel?  I don't know.

1          THE WITNESS:  I don't think that he's been
2    disrespectful.  I think he's been -- as I've told the
3    defendant, I think he's tried to be more explaining than any
4    attorney I've ever seen.  I mean, he's gone over every detail,
5    going over all the records, the discovery, pulling documents,
6    doing things way more than most attorneys do with defendants.
7          THE COURT:  This is a child sex trafficking case.
8          THE WITNESS:  Yes, sir.
9          THE COURT:  Very sensitive with very high penalties.
10         THE WITNESS:  Yes, sir.
11         THE COURT:  All right.  Do you think the relationship,
12   from your observation, the relationship between Mr. Harviel and
13   the defendant is such that it would be difficult for
14   Mr. Harviel to continue in the case?
15         THE WITNESS:  Oh, yes, sir.  Yes, sir, I think --
16         THE COURT:  Do you think even if Mr. Harviel attempted
17   to continue in the case that that attempt would be rejected by
18   Mr. Jones?
19         THE WITNESS:  Yes, sir.
20         THE COURT:  I am going to ask you directly:  Was the
21   "N" word ever used by Mr. Harviel as to the defendant?
22         THE WITNESS:  I never heard that at all, nothing of
23   that nature.
24         THE COURT:  Okay.  Was Mr. Harviel's conduct as the
25   conduct that you would expect a lawyer to display?

1         THE WITNESS: Yes, sir.

2         THE COURT: All right. Any other questions?

3         MR. HARVIEL: No, Your Honor.

4         THE COURT: Any questions by the Government?

5         Obviously this is a very serious matter, and I know
6 that Judge Mays had not contemplated that there would be a
7 replacement of counsel. I know that that was not contemplated.
8 Generally the law does not provide that a defendant will have
9 the lawyer of his choice and he will not be allowed to dictate
10 the conduct of the lawyer. The lawyer has to act as an
11 independent adviser, loyal to his client who, of course, would
12 be Mr. Jones in this case.

13         Does the Government have any observation about what
14 might be best as we go forward in the matter?

15         MS. IRELAND: Your Honor, we have no questions for the
16 witness. Obviously leave it to Your Honor's discretion.

17         However, if Your Honor does determine that Mr. Harviel
18 should be relieved of his obligation in this case because of an
19 irreparable relationship with his client, we would ask Your
20 Honor to appoint from the CJA panel rather than the Federal
21 Defender's office. We're trying to make sure there's no
22 conflict among cases, and I think there may be.

23         THE COURT: I fully understand that.

24         MS. IRELAND: Thank you.

25         THE COURT: I'm going to ask Mr. Jones.

1              Mr. Jones, I know that you've made it clear that you
2     would like to have a different attorney in the case.
3              THE DEFENDANT:  Yes, sir.
4              THE COURT:  Is that still the case?
5              THE DEFENDANT:  Yes, sir.
6              THE COURT:  All right.  Well, what I'm going to do is
7     this.  The Court doesn't find that Mr. Harviel's done anything
8     professionally inappropriate and certainly he's not used the
9     language that's been set out and very disturbing to the Court
10    that people would make -- would appear to be -- I don't know
11    for sure -- appear to be based on the evidence that I have
12    clearly false accusations as to counsel's conduct.
13             I do understand, however, for a long period of time
14    you have wanted to have a new attorney.  These are very serious
15    cases with very large penalties.  It's been the Court's
16    observation it's often very difficult for the defendant, when
17    counsel candidly tells him about where the case stands,
18    initially to accept that.  So, it's been my experience that in
19    these types of cases it's not been uncommon for us to have a
20    second attorney, unfortunately, 'cause I don't think it
21    reflects badly on our local attorneys.  I think it simply
22    reflects on the difficulty of cases.
23             In this case the Court does find that there is a
24    non-reparable relationship.  It's irreparably damaged and that
25    the only course the Court can reasonably take is to appoint

1  another attorney.

2  What I'm going to do is I'm going to have the marshal
3  service take you to the magistrate judge for appointment of an
4  attorney from the CJA panel.  There are a number of attorneys
5  on the CJA panel who have prior history with these types of
6  cases.  So, I think they will be aware of that.  We need to
7  make them aware that this is the type of case it is.  It
8  involves allegations of child sex trafficking.

9  And it might be desirable, if it's possible, to have
10 an attorney -- Mr. Harviel's also experienced in these types of
11 cases -- to have an attorney who's experienced in these types
12 of cases available.  It's just an area where experience can be
13 quite helpful to everybody.

14 I do find specifically that Mr. Harviel did not say
15 the words that were asserted in this case.  There's simply no
16 factual basis to support that.

17 I do, of course, find that the relationship is
18 irreparably harmed; and we'll get you a new lawyer.

19 Anything else?

20 THE DEFENDANT:  I got witnesses as well.  I didn't
21 know I was coming today to get a new attorney but witnesses
22 actually at the -- the officer at the CCA, they heard him say
23 what he ...

24 THE COURT:  Well, I think that we're at the same place
25 in any event.  Where we are is that I'm convinced that it's

1  just not a reparable relationship; and when that happens, we
2  would appoint a new attorney no matter what.  So, that's what
3  we need to do is get you a new attorney.
4        That means there will be some delay.  I'm sorry.  I
5  don't know anything new who is going to communicate that
6  immediately to Magistrate Judge Pham so he will know that a new
7  lawyer will be appointed.  Hopefully they'll get somebody that
8  can see you certainly this week and begin the process of
9  preparing for the remaining motions that they need to address.
10       Then, of course, the case is set for trial; and that's
11 what I was worried about.  I'm going to let Judge Mays address
12 that when he returns, but it will mean that it may well have to
13 be reset.
14       Okay.  I do appreciate it.  Thanks for being here
15 today; and, of course, I did need to know that information.
16       MR. HARVIEL:  Thank you, Judge.
17       THE COURT:  So, we're going to let everybody else be
18 excused.  We'll come back to the case that's still in process.
19 Okay.  That will take care of it.  Thanks very much.
20       (Clark Chapman is excused.)
21       (Whereupon the proceedings adjourned.)
22
23
24
25

UNREDACTED TRANSCRIPT

C E R T I F I C A T E

     I, Nicole M. Warren, RMR, CRR, do hereby certify that the foregoing pages are unredacted and to the best of my knowledge, skill, and ability are a true and accurate transcript from my stenotype notes of the Motion Hearing on May 2, 2016, in the matter of:

  United States of America vs. Brandon Jones.

  Dated this 2nd day of May, 2016.

Nicole M. Warren, RMR, CRR
Official Court Reporter
United States District Court
Western District of Tennessee